UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

_____

KEITH TOLBERT,                :
          Plaintiff,       :
                      :
     v.                  :    No.   2:22-cv-1228
                      :
NICOLA S. WIENER, *REPRESENTATIVE FOR*  :
*THE ESTATE OF STEPHEN WIENER,* MANDY  :
SIPPLE, ANN LEWIS, and OFFICER A. JONES,  :
          Defendants.     :

_____

## O P I N I O N
**Wiener's Motion for Summary Judgment, ECF No. 124 - Granted**
**Sipple, Lewis, and Jones' Motion for Summary Judgment, ECF No. 125 – Granted**
**Tolbert's Partial Motion for Summary Judgment, ECF No. 151 – Denied**

**Joseph F. Leeson, Jr.**                     **February 12, 2024**
**United States District Judge**

## I.    INTRODUCTION

Plaintiff Keith Tolbert initiated this action pursuant to 42 U.S.C. § 1983 against

defendants Dr. Stephen Wiener, Mandy Sipple, Ann Lewis ("Nurse Lewis"), and Officer A.

Jones ("CO Jones") for, *inter alia*, medical malpractice and deliberate indifference to his medical

needs regarding treatment he received while incarcerated at SCI Phoenix. Defendants Sipple,

Nurse Lewis, and CO Jones (collectively "Commonwealth Defendants") have moved for

summary judgment. Defendant Wiener, substituted by Nicola Wiener for Dr. Wiener's estate

(hereinafter "Dr. Wiener" or "Defendant Wiener"), has also separately moved for summary

judgment. Tolbert opposes both motions and has filed a partial motion for summary judgment

regarding his claims against Dr. Wiener. For the reasons set forth below, the Court grants the

Commonwealth Defendants' motion, grants Defendant Wiener's motion, and denies Tolbert's motion.

## II.     BACKGROUND

### A.     Undisputed Material Facts

On November 26, 2019, Tolbert underwent surgery at Einstein Medical Hospital after sustaining facial and head injuries at SCI Phoenix, the prison where he was housed at the time. Commonwealth Defendants' Statement of Undisputed Facts ("Comm. SUF"), ECF No. 124-1, at ¶¶ 1-2.  On December 10, 2019, Tolbert returned to Einstein Medical Hospital once more for a post-surgical follow-up with Dr. Seth Zwillenberg, an ENT doctor.  Comm. SUF at ¶¶ 32-33; Tolbert MSJ, Ex. "Dr. Zwillenberg Letter" at 81.[1]  At this follow-up appointment, Dr. Zwillenberg recommended that Tolbert be referred to an ophthalmologist and neurologist due to Tolbert reporting headaches and vision changes.  Tolbert MSJ, Ex. "Dr. Zwillenberg Letter" at 81; Wiener MSJ, ECF No. 125-8, Ex. "DC-472B – Progress Notes" at 5.

After the surgery, Tolbert was discharged from the hospital and placed in the infirmary at SCI Phoenix, where he was seen by Dr. Wiener and Nurse Lewis, among other providers. Comm. SUF at ¶¶ 3-4.  On the morning of December 11, 2019, Tolbert was still recovering in the infirmary room, and Nurse Lewis, Tolbert's attending nurse, attempted to give Tolbert Tylenol for his pain.  Comm. SUF at ¶¶ 3, 4, 6.  However, Tolbert refused to take the Tylenol, asserting that he was prescribed oxycodone staggered with Motrin, not Tylenol.  Comm. SUF at ¶¶ 5, 7.  In response to this refusal, Nurse Lewis brought Defendant Jones, a corrections officer, into the room and instructed CO Jones to tell Tolbert to take the Tylenol. Comm.  SUF at ¶¶ 8-9. CO Jones told Tolbert, "Listen, I don't want to have to give you a misconduct."  Comm. SUF at

---

[1]       This Court has adopted the pagination assigned by the Electronic Filing System.

¶ 10.  Nonetheless, Tolbert again refused to take the Tylenol, and Nurse Lewis and CO Jones left the room. Comm. SUF at ¶¶ 11-12.

Later that same morning, Tolbert suffered a fall in the infirmary.  After Nurse Lewis and CO Jones had left him, Tolbert got up to use the bathroom, but on the way back to his infirmary bed, Tolbert got dizzy, blacked out, fell on the floor, and hit his head.  Comm. SUF at ¶¶ 13-15.  Tolbert's cellmate, William Holden, witnessed the fall and contacted the nurses' station.  Comm. SUF at ¶¶ 16-17.  Approximately ten minutes later, Nurse Lewis, CO Jones, and Jill McGinley,[2] another nurse, entered the room.  Comm. SUF at ¶ 17.  Tolbert was laying on the floor when they arrived.  Comm. SUF at ¶ 20.  After taking his vitals, Nurse Lewis directed staff to leave Tolbert on the floor.  Comm. SUF at ¶ 19.  Tolbert remained on the floor for a total of 30 to 40 minutes after his fall.  Comm. SUF at ¶ 25.  Commonwealth Mot. Summ. Jdgmt. (Comm. "MSJ"), at Ex. A ("Tolbert Dep."), at 30:14-19.  At some point Nurse Lewis left the room, but later returned to assist him with a wheelchair.  Comm. SUF at ¶ 26.

Within hours of his fall, Tolbert was seen by Dr. Wiener.  Comm. SUF at ¶ 30.  At this appointment, Tolbert complained to Dr. Wiener about Nurse Lewis' treatment and requested to see an ophthalmologist and neurologist.  Comm. SUF at ¶ 34.  Dr. Wiener ordered an ophthalmology consult but did not refer Tolbert to a neurologist.  *See* Wiener MSJ, ECF No. 125-7, at Ex. B ("DC-472I – Infirmary Progress Note") at 20; ECF No. 125-8 at 1.

Tolbert filed two grievances related to the above-described events, Grievance Number 840450 and Grievance Number 860352.  Comm. SUF at ¶ 50.  In the first, Tolbert complains about his fall in the infirmary and subsequent treatment or lack thereof.  Comm. SUF at ¶ 51; Comm. MSJ, at Ex. G ("Grievance Number 840450").   In the second, Tolbert complains about

---

[2]      Nurse McGinley is not a named defendant.

his neurology referral not being honored by Dr. Wiener and other prison medical staff.  Comm.

SUF at ¶ 53; Comm. MSJ, at Ex. H ("Grievance Number 860352").

On July 14, 2020, Tolbert was transferred from SCI Phoenix to SCI Somerset. Tolbert

Dep. at 50:16-21; Comm. SUF ¶ 2. Nearly two years later, on March 16, 2022, Tolbert was

finally seen by a neurologist.  *See* Tolbert MSJ, Ex. "AHN Teleneurology," at 180; Tolbert Dep.

at 51:4-5.

### B.    Procedural History

Tolbert initiated this action in the Court of Common Pleas of Montgomery County and

filed an Amended Complaint against several defendants alleging medical malpractice*,* First

Amendment retaliation, and deliberate indifference to his medical needs under the United States

and Pennsylvania constitutions.  *See* Not. Remov., ECF No. 1-4 ("Compl.").   Shortly thereafter,

the Commonwealth Defendants, which at that time included defendants George Little and the

Pennsylvania Department of Corrections ("DOC"), removed the action to this Court.  *See* Not.

Remov.  Tolbert voluntarily dismissed Defendants Little, DOC, and Wellpath Health Services.

*See* Orders, ECF Nos. 41 & 50.  This Court dismissed Tolbert's Pennsylvania constitutional

claims,[3] as well as his retaliation claim against Dr. Wiener.  *See* Order, ECF No. 54.   At the

close of discovery, the Commonwealth Defendants and Dr. Wiener filed separate motions for

summary judgment, arguing, *inter alia*, that the claims against them are unexhausted or fail as a

matter of law.  Comm. MSJ, ECF No. 124; Wiener MSJ, ECF No. 125.  Tolbert opposes both

motions and filed a partial motion for summary judgment, pertaining only to his claims against

---

[3]     Although the Commonwealth Defendants present argument on Tolbert's Pennsylvania
Constitutional claims, the Court notes for clarity that Tolbert's Pennsylvania Constitutional
claims were already dismissed in their entirety shortly after he dropped his request for injunctive
relief, *see* Order, ECF No. 54; Op., ECF No. 19, at 14 n.4, and therefore those claims will not be
discussed further in this Opinion.

Dr. Wiener, arguing, *inter alia*, that material disputes of fact exist precluding summary judgment on all claims.  *See* Tolbert MSJ, ECF No. 151; Tolbert Resp., ECF No. 150.

## III.    LEGAL STANDARDS

### A.    Motion for Summary Judgment – Standard of Review – Review of Applicable Law

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A disputed fact is "material" if proof of its existence or nonexistence might affect the outcome of the case under applicable substantive law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  An issue of material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  *Id.* at 257.  Once such a showing has been made, the non-moving party must go beyond the pleadings with affidavits, depositions, answers to interrogatories or the like in order to demonstrate specific material facts which give rise to a genuine issue.  Fed. R. Civ. P. 56(c); *Celotex Corp.*, 477 U.S. 317 at 324; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (stating that the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts"). The court must consider the evidence in the light most favorable to the non-moving party.  *Scott v. Harris*, 550 U.S. 372, 378 (2007).  Nevertheless, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."  *Id.* at 380.

**B.      Exhaustion under the Prison Litigation Reform Act ("PLRA") – Review of Applicable Law**

The Prison Litigation Reform Act ("PLRA") requires prisoners to exhaust all available administrative remedies before bringing suit related to the conditions of their confinement. 42 U.S.C. § 1997e(a).  *See Woodford v. Ngo*, 548 U.S. 81, 88 (2006) (explaining that proper exhaustion under the PLRA requires a prisoner to "complete the administrative review process in accordance with the applicable procedural rules").  *See also Alexander v. Forr*, No. 3:04-0370, 2005 U.S. Dist. LEXIS 50996, at *18 (M.D. Pa. July 26, 2005) ("If a prisoner does not exhaust available administrative remedies, the claims should be dismissed.") (citing *Moscato v. Fed. Bureau of Prisons*, 98 F.3d 757, 761-62 (3d Cir. 1998)).  An inmate's failure to exhaust these administrative remedies is an affirmative defense that, if brought, must be proven by the defendant.  *See Rinaldi v. United States*, 904 F.3d 257, 268 (3d Cir. 2018) (citing *Ray v. Kertes*, 285 F.3d 287, 295 (3d Cir. 2002).  The mandatory exhaustion requirement has one exception, which is that "administrative remedies must be available to the prisoner."  *Downey v. Pa. Dep't of Corr.*, 968 F.3d 299, 305 (3d Cir. 2020) (citing *Ross v. Blake*, 578 U.S. 632, 643 (2016)).  *See Rinaldi,* 904 F.3d 257 at 268 ("[O]nce the defendant has established that the inmate failed to resort to administrative remedies, the onus falls on the inmate to show that such remedies were unavailable to him.").  "[A]n administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end — with officers unable or consistently unwilling to provide any relief to aggrieved inmates."  *Ross*, 578 U.S. at 643.

"The purpose of the grievance process is to 'put the prison officials on notice of the persons claimed to be guilty of wrongdoing.'"  *White v. Wireman*, No. 16-675, 2018 U.S. Dist. LEXIS 177699, at *34-35 (M.D. Pa. Oct. 15, 2018) (quoting *Spruill v. Gillis*, 372 F.3d 218, 234

(3d Cir. 2004)), adopted by 2020 U.S. Dist. LEXIS 29769 (M.D. Pa., Feb. 21, 2020).  Therefore, to put officials on notice, the relief requested in an inmate's initial grievance must typically be stated "with specificity[,]" subject to the applicable prison grievance policy.  *See Wright v. Sauers,* No. 13-358*, 2017 U.S. Dist. LEXIS 139501, at *18 (W.D. Pa. Aug. 30, 2017) (quoting *Spruill*, 372 F.3d at 233-234).  *See also Preacher v. Overmyer*, No. 17-18. 2020 U.S. Dist. LEXIS 914, at *20 (W.D. Pa. Jan. 3, 2020) ("[A]n inmate who 'desires compensation or other legal relief normally available from a court' must 'request the relief with specificity in his/her initial grievance.'") (citation omitted).  However, for exhaustion purposes, an inmate's grievance need not "perfect[ly] overlap" with the claims in the complaint, so long as there is a "shared factual basis between the two[.]" *See Jackson v. Ivens*, 244 Fed. Appx. 508, 513 (3d Cir. 2007) (citing *Woodford*, 548 U.S. at 95 ("The benefits of exhaustion can be realized only if the prison grievance system is given a fair opportunity to consider the grievance.")).

### C.    Deliberate Indifference under the Eighth Amendment – Review of Applicable Law

The Eighth Amendment to the United States Constitution prohibits "deliberate indifference to serious medical needs of prisoners" because such treatment, or lack thereof, "constitutes . . . unnecessary and wanton infliction of pain[.]" *Estelle*, 429 U.S. at 104 (internal marks and citation omitted).  However, mere negligence in diagnosing or treating a medical condition does not state a claim under the Eighth Amendment.  *Id.* at 105-06.   Rather, to state a deliberate indifference claim under the Eighth Amendment, "a prisoner must make (1) an 'objective' showing that the prisoner's medical needs were sufficiently serious and (2) a 'subjective' showing that the prison official acted with a sufficiently culpable state of mind." *Mitchell v. Gershen*, 466 F. App'x 84, 86 (3d Cir. 2011) (citation omitted).

The concept of a serious medical need has two components: (1) the prisoner's "condition must be such that a failure to treat can be expected to lead to substantial and unnecessary suffering, injury, or death," and (2) "the condition must be 'one that has been diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would easily recognize the necessity for a doctor's attention.'" *Colburn v. Upper Darby Twp.*, 946 F.2d 1017, 1023 (3d Cir. 1991) (quoting *Monmouth Cnty. Corr. Inst. Inmates v. Lanzaro*, 834 F.2d 326, 347 (3d Cir. 1987)).  Examples of deliberate indifference include "where [a] prison official: (1) knows of a prisoner's need for medical treatment but intentionally refuses to provide it; (2) delays necessary medical treatment based on a non-medical reason; or (3) prevents a prisoner from receiving needed or recommended treatment." *Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999) (citation omitted) ("Deliberate indifference 'requires obduracy and wantonness, which has been likened to conduct that includes recklessness or a conscious disregard of a serious risk.' (cleaned up)).  However,

> short delays in treatment unaccompanied by arbitrary or unduly burdensome bureaucratic procedures, and the refusal to summon the medical specialist of the inmate's choice, perform tests or procedures that the inmate desires, or to explain to the inmate the reason for medical action or inaction does not amount to cruel and unusual punishment.

*Roman v. Little*, No. 19-cv-5204, 2020 U.S. Dist. LEXIS 76638, at *9 (E.D. Pa. April 30, 2020) (internal quotation and citation omitted).  *See also Lopez v. Corr. Med. Servs., Inc*., 499 Fed. Appx. 142, 146 (3d Cir. 2012) (citing *Spruill v. Gillis*, 372 F.3d 218, 235 (3d Cir. 2004)) ("Mere medical malpractice, negligence, and courses of treatment inconsistent with the desires of the prisoner . . . do not constitute deliberate indifference to serious medical needs.").

Prison medical authorities are given considerable latitude in the diagnosis and treatment of inmate patients, *Young v. Kazmerski*, 266 Fed. Appx. 191, 194 (3d Cir. 2008), and mere disagreement as to proper care does not support a finding of deliberate indifference.  *White v. Napoleon*, 897 F.2d 103, 110 (3d Cir. 1990).  *See also Basemore v. Vihlidal*, No. 13-669, 2014 U.S. Dist. LEXIS 20603, at *37-38 (W.D. Pa. Jan. 30, 2014) ("[D]isagreement as to the appropriate choice of medical treatment does not give rise to a constitutional violation because the 'right to be free from cruel and unusual punishment does not include the right to the treatment of one's choice.'") (quoting *Layne v. Vinzant*, 657 F.2d 468, 473 (1st Cir. 1981)). However, a complete failure to treat an inmate patient may support a finding of deliberate indifference.  *See Miller v. Beard*, 699 F. Supp. 2d 697, 707 (E.D. Pa. 2010) ("Although an isolated failure to treat, without more, is ordinarily not actionable, it may in fact rise to the level of a constitutional violation if the surrounding circumstances suggest a degree of deliberateness, rather than inadvertence, in the failure to render meaningful treatment.") (internal quotation and citation omitted).  Additionally, a deliberate failure to provide prescribed medical care, or a "prison doctor's choice of an ineffective course of treatment in contravention of another physician's explicit orders or the choice of an 'easier and less efficacious treatment' may establish deliberate indifference." *Rodriguez v. Smith*, No. 03-3675, 2006 U.S. Dist. LEXIS 10726, at *45 (E.D. Pa. March 16, 2006) (citation omitted).

> **D.    Retaliation under the First Amendment – Review of Applicable Law**

"Retaliation for the exercise of constitutionally protected rights is itself a violation of rights secured by the Constitution actionable under section 1983." *Napoleon*, 897 F.2d at 111-12.

> In order to set forth a cognizable claim for First Amendment retaliation, a plaintiff must allege that '(1) he engaged in a

> constitutionally protected activity; (2) he suffered, at the hands of a
> state actor, adverse action sufficient to deter a person of ordinary
> firmness from exercising his constitutional rights; and (3) the
> protected activity was a substantial or motivating factor in the state
> actor's decision to take adverse action.'

*Washington v. Barnhart*, No. 17-00070, 2020 U.S. Dist. LEXIS 69545, at *15 (W.D. Pa. April

20, 2020) (quoting *Fantone v. Latini*, 780 F.3d 184, 191 (3d Cir. 2015)).  "Further, to establish

the critical element of causation, a plaintiff usually must allege 'either (1) an unusually

suggestive temporal proximity between the protected activity and the allegedly retaliatory action,

or (2) a pattern of antagonism coupled with timing to establish a causal link.'"  *Id.* (quoting

*Lauren W. v. DeFlaminis*, 480 F.3d 259, 267 (3d Cir. 2007)).

### E.  Medical Malpractice under Pennsylvania Law – Review of Applicable Law

Under Pennsylvania law, "a plaintiff seeking damages for medical malpractice must

'establish a duty owed by the physician to the patient, a breach of that duty by the physician, that

the breach was the proximate cause of the harm suffered, and the damages suffered were a direct

result of the harm.'" *Maresca v. Mancall*, 135 Fed. Appx. 529, 531 (3d Cir. 2005) (quoting

*Toogood v. Rogal*, 824 A.2d 1140, 1145 (Pa. 2003)).  Additionally, plaintiffs must file a valid

"certificate of merit" under Rule 1042.3 of the Pennsylvania Rules of Civil Procedure. Pa. R.

Civ. P. 1042.3.  *See also Tisdale v. Zaloga*, No. 19-1022, 2019 U.S. Dist. LEXIS 187981, at *8-9

(M.D. Pa. Oct. 30, 2019) ("The requirements of Rule 1042.3 are deemed substantive in nature

and, therefore, federal courts in Pennsylvania must apply these prerequisites of Pennsylvania law

when assessing the merits of a medical malpractice claim.").  This rule, which applies to

plaintiffs' complaints regardless of whether they are counseled or *pro se*, provides that the

certificate of merit must contain either (1) a written statement from a licensed professional as to

causation and stating that the defendant's conduct fell outside of the acceptable standard of care,

(2) a statement that the allegations against the defendant are solely based on the defendant's supervisory role over other licensed professionals who deviated from the standard of care, or (3) a statement that expert testimony is not necessary for the prosecution of the claim. *See* Pa. R. Civ. P. 1042.3(a)(1-3).

One a plaintiff has certified that expert testimony is not needed to prosecute his claim, "he is bound by that certification and absent exceptional circumstances is precluded from introducing the expert testimony he needs on the standard of care and causation." *Moore v. Wetzel*, No. 18-1523, 2019 U.S. Dist. LEXIS 36900, at *36 (M.D. Pa. March 16, 2019) (citing *Rodriguez v. United States*, No. 14-1149, 2016 U.S. Dist. LEXIS 112144, at *22 (M.D. Pa. Aug. 23, 2016) (quoting Pa. R. Civ. P. 1042.3(a)(3)), *aff'd*, 695 Fed. Appx. 669 (3d Cir. 2017)). Therefore, a plaintiff's certification that expert testimony is unnecessary may ultimately become fatal to his medical malpractice claim at the summary judgment stage. *See id.*

## IV.   ANALYSIS

### A. Exhaustion

Before proceeding to Tolbert's substantive claims, the Court must first address the exhaustion defenses presented by defendants Sipple, Jones, and Wiener. *See Downey v. Pennsylvania Dep't of Corr.*, 968 F.3d 299, 304-05 (3d Cir. 2020) ("Exhaustion is a threshold requirement that district courts must consider.") (citations omitted). Defendants Sipple, Jones, and Wiener argue that the claims against them are unexhausted. After review, the Court finds that Tolbert has exhausted his administrative remedies for all claims except for those against defendant Sipple and for one of his claims against Dr. Wiener.[4]

---

[4]     Dr. Wiener does not argue that the claim that he was deliberately indifferent to Tolbert's medical needs for failing to refer Tolbert to a neurologist was unexhausted.

Tolbert filed two grievances about the events herein.  The first related to the events surrounding his fall in the infirmary, and the second related to medical staff's failure to send him to a neurologist.  The Court will address the claims in each grievance in turn. But first, the Court will turn to the applicable grievance policy.

Here, the applicable Pennsylvania Department of Corrections grievance policy is DC-ADM 804, which states that an inmate "must include a statement of the facts relevant to" his claim, and the statement should include, *inter alia*, (1) "the date, approximate time, and location" of the underlying events, (2) the identity of "individuals directly involved" in the events, (3) "specifically state[d] claims . . . concerning violations of Department directives, regulations, court orders, or other law[,]" and "the specific relief sought" if compensation or other relief is requested.  *See* DC-ADM 804, *Inmate Grievance System Policy* (May 1, 2015).

First, in Grievance Number 840450, Tolbert relayed the events of December 11, 2019, when he fell in the prison infirmary.  *See* Comm. MSJ, at Ex. G ("Grievance Number 840450"), ECF No. 124-8, at 5.  In the grievance, Tolbert names Nurse Lewis and CO Jones.[5]  *Id.* Regarding CO Jones, the Court finds that Tolbert's claims against this defendant are properly exhausted.  Tolbert alleges that, the morning of his fall, Nurse Lewis "brought me the wrong medication and tried to force me to take it several times [through] the officer-on-duty CO A. Jones."  *Id.*  Additionally, Tolbert alleges that CO Jones witnessed Nurse Lewis's alleged refusal to help him off the floor after his fall.  *Id.*  Although Tolbert does not specifically allege that CO Jones was deliberately indifferent to his medical needs, and therefore this grievance does not "perfectly overlap" with the Complaint, the facts were still set out with sufficient specificity to

---

[5]     Defendant Lewis does not argue that the claims against her are unexhausted.

put prison officials on notice of CO Jones's direct involvement in the underlying incident. Therefore, Tolbert's claims against CO Jones were exhausted and are properly before this Court.

However, regarding Defendant Wiener, the Court finds that Tolbert's fall-related claims against Defendant Wiener are unexhausted and must be dismissed.  Although Tolbert does not actually name Dr. Wiener in the above-mentioned grievance, he does refer to a "Dr. Wynn." Even putting aside this misidentification and assuming that Tolbert meant "Dr. Wiener," Tolbert does not allege any wrongdoing from Dr. Wiener.  Tolbert simply states that he saw Dr. Wiener "and told him I had [fallen] and Nurse Lewis left me on the ground and also tried to force me to take the wrong medication (Tylenol).  Dr. [Wiener] said he would tell the Nurse Supervisor and that I could write a grievance on the incident." *Id*. at 6.  Tolbert does not allege that Dr. Wiener witnessed or was directly involved in either incident with Nurse Lewis, failed to treat any resulting injury, or engaged in any other wrongdoing related to this incident.[6]  Consequently, Tolbert's fall-related claims against Dr. Wiener were not stated with sufficient specificity in Grievance Number 840450 in order to put prison officials on notice that Tolbert was seeking relief for Dr. Wiener's alleged failure to properly treat Tolbert related to his fall in the infirmary. As a result, Tolbert's claims against Dr. Wiener for medical malpractice and deliberate indifference, solely as they relate to Tolbert's fall, have not been exhausted and are not properly before this Court for review.

Second, in Grievance Number 860352, Tolbert alleges that "medical staff" at SCI Phoenix refused to honor a neurology referral.  Comm. MSJ, at Ex. H ("Grievance Number 860352"), ECF No. 124-9, at 5. Tolbert specifically names Dr. Wiener in this grievance, among

---

[6]    Tolbert also does not mention in any grievance his allegation that Dr. Wiener's failure to address that the 24-hour prison infirmary lights contributed to his fall in the infirmary.  *See* Compl. ¶ 16.

other medical personnel.  *Id*.  However, Tolbert does not mention Defendant Sipple at all, let alone suggest that she prevented him from seeing a neurologist or that she did so in retaliation because he filed grievances.  *See id*.  Therefore, the claims against Defendant Sipple are unexhausted and must be dismissed.

With regard to his unexhausted claims against Dr. Wiener, Tolbert argues that he was prevented from filing grievances by prison officials about Dr. Wiener's treatment related to his fall on December 11, 2019, either by prison officials or due to his medical condition.  *See* Tolbert MSJ at 38-39.  However, this is belied by the record, which demonstrates that, in the three weeks following this visit with Dr. Wiener, Tolbert filed eight grievances (including one of the above-discussed grievances).  *See* Wiener Reply, ECF No. 156-1 ("Grievance History Form") (documenting eight grievances filed by Tolbert between December 17, 2019, and December 31, 2019).  *See also* DC-ADM 804, *Inmate Grievance System Policy* (May 1, 2015) ("The inmate must submit a grievance to the Facility Grievance Coordinator/designee . . . within 15 working days after the event upon which the claim is based.").   Therefore, the Court finds that Tolbert had access and adequate opportunity to file a timely grievance against Dr. Wiener for his fall-related treatment and failed to do so.

### B.  Deliberate Indifference

*1.  Dr. Wiener*

Although there are some facts potentially in dispute regarding Dr. Wiener's alleged failure to honor Tolbert's neurology referral, even when all of the facts are resolved in Tolbert's favor, his deliberate indifference claim against Dr. Wiener cannot survive summary judgment.

Looking at the facts in Tolbert's favor, as the Court must, Tolbert medical records confirm that Dr. Zwillenberg recommended that Tolbert see a neurologist and ophthalmologist

due to Tolbert's complaint of persistent headaches following his December 2019 surgery.

Shortly thereafter, at a visit with Tolbert on December 11, 2019, Dr. Wiener agreed to send

Tolbert to an ophthalmologist.  However, Dr. Wiener did not schedule Tolbert for a neurology

appointment, observing that Tolbert had a "mild concussion" and making a note to "consult Tele

Neuro if HA [headaches] do not resolve over next 2-4 weeks[.]"  *See* DC-472I – Infirmary

Progress Note"), ECF No. 125-8, at 1. Although Tolbert continued to complain about his

persistent headaches in the following months, his request for a neurology appointment was not

granted until months later by another provider.  *See* Wiener MSJ, "DC-472 – Progress Note,"

ECF NO. 125-4, at 2-3 (another doctor noting "[p]laced neurology consult").[7]

Over two years after his initial request, Tolbert finally saw a neurologist, Dr. Kevin

Kelly, on March 16, 2022, while housed at SCI-Somerset.  *See* Tolbert MSJ, Ex. "AHN

Teleneurology," at 180.   At the long-awaited neurology appointment, Dr. Kelly assessed Tolbert

and found that he had "posttraumatic neuropathic facial pain and posttraumatic headache." *See*

*id*.  However, Dr. Kelly "did not recommend any significantly new medical treatment[,]" other

than a different pain medication for Tolbert's headaches, which he refused to take for religious

reasons.  *See* Wiener MSJ, "Verification of Kansky Delisma, MD," ECF No. 125-11, ¶ 6.  *See*

*also* Tolbert MSJ, Ex. "AHN Teleneurology," at 180 ("It was recommended that he use

amitriptyline and divalproex at night for preventative treatment of both headache and facial pain

but he refused use of the medications.  He noted that he will not use certain medications because

of his religious beliefs.  He asked if Neurontin was a possibility and was told that its use was

restricted in the facility.").  Ultimately, Dr. Kelly observed that "prospects for effective

---

[7]     It appears from the record that the neurology consult was ultimately further delayed or
fell under the radar after Tolbert's transfer to another prison facility in July 2020.  *See* Tolbert
Dep. at 50:16-21

intervention are limited because of the patient's unwillingness to take recommended medications for his pain syndrome." *See* Tolbert MSJ, Ex. "AHN Teleneurology," at 180.

Although Tolbert continues to insist that he was completely denied medical treatment by Dr. Wiener, it appears to the Court at this stage that he is challenging the "adequacy, appropriateness, and effectiveness" of the treatment he received from Dr. Wiener, making this is a "classic case" where Tolbert simply disagrees with the medical treatment rendered. *See Baez v. Falor*, 566 Fed. Appx. 155, 158 (3d Cir. 2014). Tolbert's submissions on summary judgment, accompanied by his medical records, bely the accusation that he was completely denied treatment by Dr. Wiener.

Tolbert's claim cannot survive summary judgment because the record is devoid of any evidence that could establish Dr. Wiener's subjective intent. In other words, Tolbert cannot establish that Dr. Wiener knew failing to send Tolbert to a neurologist would present a substantial risk of harm to Tolbert. Looking at the few facts that may point to Dr. Wiener's state of mind, the record shows that on December 11, 2019, Dr. Wiener declined to send Tolbert to a neurologist for his headaches, but, at the same appointment, referred Tolbert to an ophthalmologist for his nearsightedness. *See* Wiener MSJ, ECF No. 125-7, at Ex. B ("DC-472I – Infirmary Progress Note") at 20; ECF No. 125-8 at 1 (observing that "inmate returned from ENT last evening with Zygomatic splint removed and requested referrals to Ophth[amology] and neurology for post[-]concussion near sightedness and migraine[-]like headaches"). Dr. Wiener examined Tolbert, diagnosed him with a mild concussion, and made a note that he would follow-up on Tolbert's headaches in two to four weeks to consider a neurology consult. *See id*. These facts support the inference that Dr. Wiener made a deliberate decision to send Tolbert to the ophthalmologist, but not to send Tolbert to the neurologist, and that these decisions were made

for medical reasons after he personally examined and diagnosed Tolbert.[8]  There are no other

facts in the record to support an inference that Dr. Wiener declined to send Tolbert to the

neurologist for non-medical reasons, and a reasonable factfinder could not find Dr. Wiener liable

for his conduct under the Eighth Amendment.  *See Baez v. Falor*, 566 Fed.Appx. 155, 157 (3d

Cir. 2014) (holding that delay in scheduling outside follow-up medical treatment for inmate was

not cruel and unusual punishment and there was no subjective showing of deliberate

indifference).  Although Dr. Wiener failed to follow up with Tolbert regarding his headaches and

a possible neurology consult, this oversight bespeaks of negligence, which is not sufficient to

support a deliberate indifference claim.  *See Pearson v. Prison Health Serv*., 850 F.3d 526, 543

(3d Cir. 2017) (holding that a doctor's negligent failure to order prescribed treatment only

amounted to negligence, and therefore could not support a deliberate indifference claim).

Even assuming that Tolbert could prove subjective intent, Dr. Wiener further argues that

Tolbert has failed to produce evidence that his injuries were exacerbated by Dr. Wiener's failure

honor the neurology referral, and this failure is detrimental to Tolbert's claim for relief.  This

Court agrees that this is one of the unusual cases where medical expert testimony would be

necessary to establish deliberate indifference for the adequacy of care rendered.

---

[8]     Even assuming that Dr. Wiener knew that Tolbert's requests to see an ophthalmologist
and neurologist were based on the recommendation of another doctor, there is nothing in the
record, other than Tolbert's conclusory assertions, suggesting that Dr. Wiener outright refused to
allow a neurology consult to take place. *See Pearson v. Prison Health Serv*., 850 F.3d 526, 543
(3d Cir. 2017) ("Unlike in our prior interference-with-prescribed treatment cases, there is nothing
in the record indicating that [the defendant doctor] refused to allow [the plaintiff] to receive the
prescribed treatment, let alone that [the defendant doctor] knew that the lifting restriction or the
follow-up appointment had been prescribed.  Absent such evidence, this claim is merely that [the
defendant doctor] negligently failed to order the prescribed treatment, and, because deliberate
indifference entails something more than mere negligence, no reasonable jury could find him
liable for this conduct under the Eighth Amendment.") (cleaned up).

Prisoners are not typically required to produce verified medical evidence or an expert to bring a claim for deliberate indifference.  However, in delayed-treatment claims, an inmate may be required to submit verified medical evidence "to establish the detrimental effect" of the delay in medical treatment,  *see Altenbach v. Ianuzzi*, 646 F. App'x 147, 152 (3d Cir. 2016) (nonprecedential) (requiring inmate to submit "'verif[ied] medical evidence . . . to establish the detrimental effect of [the] delay' [in medical treatment]"), and in adequacy-of-care claims, an inmate may be required to submit extrinsic evidence or medical expert testimony "where evaluating whether medical treatment is adequate presents an objective question [] beyond the competence of a non-medical professional." *See Pearson v. Prison Health Serv*., 850 F.3d 526, 536 (3d Cir. 2017) (explaining that that in some cases "medical expert testimony may be necessary to establish deliberate indifference in an adequacy of care claim where, as laymen, the jury would not be in a position to determine that the particular treatment or diagnosis fell below a professional standard of care" but also clarifying that expert testimony "is not necessarily required where other forms of extrinsic proof may suffice").

Here, as laymen, jurors would not be in a position to determine that Dr. Wiener's treatment or failure to immediately send Tolbert to a neurologist fell below a professional standard of care, and the extrinsic evidence provided by Tolbert does not support this conclusion. It is true that Dr. Zwillenberg recommended that Tolbert see a neurologist and Dr. Wiener did not follow this recommendation.  Instead, as discussed above, Dr. Wiener conducted his own examination, diagnosed Tolbert with a mild concussion, and noted that a neurology consult would be addressed after his headaches were monitored for two to four more weeks.  Tolbert ultimately did not see a neurologist until approximately two years later, but during his remaining

months at SCI Phoenix, Tolbert continued to receive medical treatment.[9]  Although it is

unfortunate that Tolbert had continuing pain and headaches after Dr. Wiener's failure to place a

neurology consult, the long-awaited neurology visit did not provide any substantial change in

Tolbert's course of treatment.  The neurologist's recommended course of treatment, additional

pain management medication, was refused by Tolbert due to his religious beliefs, therefore

foreclosing the possibility that, had Dr. Wiener sent him to the neurologist sooner, Tolbert's

injury might have improved or might not have worsened.  Therefore, in a somewhat atypical

way, the extrinsic medical evidence submitted by Tolbert supports that there was no detrimental

effect by the delay in sending him to a neurologist.  Although Tolbert makes numerous

conclusory allegations that his continuing pain was proximately caused by Dr. Wiener's deficient

medical treatment, these unsupported suspicions are insufficient on their own to overcome a

motion for summary judgment.  *See Sutton v. Noel*, No. 19-2080, 2022 U.S. Dist. LEXIS

127159, at *49-50 (M.D. Pa. July 18, 2022) (quoting *Williams v. Borough of West Chester, Pa.*,

891 F.2d 458, 460 (3d Cir. 1989)) ("The party adverse to summary judgment must raise 'more

than a mere scintilla of evidence in its favor' in order to overcome a summary judgment motion

and cannot survive by relying on unsupported assertions, conclusory allegations, or mere

---

[9]      In the months following his visit with Dr. Wiener, several other providers at SCI Phoenix examined Tolbert, some even specifically making neurological assessments, and likewise these other providers made their own assessments about whether a neurology appointment was medically necessary. *See* Wiener MSJ, Ex. B ("Medical Records"), ECF No. 125-4 at 15 (other prison doctor (Kaminsky) noting on April 11, 2020, that Tolbert "also requested neurology [follow-up] consult . . . due to assault"); ECF No. 125-4 at 9 (other prison doctor (Bazel) noting "possible neurology referral," on May 5, 2020, but not ordering a consult, after examining assault-related injuries); Doc. 125-4 at 3 (other prison doctor (Ali) noted "[p]laced neurology consult" on May 14, 2020).  Although unclear from the record why the neurology consult placed in May 14, 2020 was delayed until March 16, 2022, it appears possibly related to Tolbert's transfer to SCI Somerset on July 14, 2020.  Nonetheless, determining the cause of the delay at that point in time, after Tolbert was no longer a patient of Dr. Wiener's, is not relevant to the claim at hand.

suspicions." ).  Given that the extrinsic medical evidence offered by Tolbert hinders rather than

helps his claim, Tolbert would need to produce medical expert testimony to establish deliberate

indifference for a claim of this sort, because a lay juror would not be in the position to determine

that Dr. Wiener's failure to send Tolbert to the neurologist fell below a professional standard of

care.

For all of those reasons, Tolbert's deliberate indifference claim against Dr. Wiener cannot

survive summary judgment.

2. *Nurse Lewis*

Although there are some facts potentially in dispute regarding Nurse Lewis's alleged

failure treat Tolbert after his fall in the infirmary, even when all of the facts are resolved in

Tolbert's favor, his deliberate indifference claim against Nurse Lewis cannot survive summary

judgment.

Looking at the facts in Tolbert's favor, as the Court must, Tolbert was left on the floor by

Nurse Lewis after his fall for approximately 30 to 40 minutes total.  After Tolbert fell in the

infirmary, his cellmate called the nurses' desk for assistance.  Tolbert Dep. at 19:21-23.  When

Nurse Lewis arrived to the infirmary room accompanied by Nurse McGinley and CO Jones, she

observed Tolbert on the floor and Tolbert vocalized that he was in pain.  *See id*. at 22:14-20.

Nurse Lewis appeared to be confused and then left the room to call Dr. Wiener for further

instructions. *See id*. at 23:3-6, 11-15. When she returned, Nurse Lewis and Nurse McGinley took

Tolbert's vitals, including his temperature and blood pressure, and performed a neurological

assessment.  Comm. MSJ, Exs. ("Lewis Report"), ECF No. 124-5; ("McGinley Report"), ECF

Nos. 124-5, 124-6.  At the time, Tolbert believed his pain was attributable to sciatica, and he

expressed this to Nurse Lewis and Nurse McGinley. Lewis Report ("Inmate stated he had back

pain and sciatica."), McGinley Report ("Inmate reported 'sciatic' pain in back and difficulty moving."); Tolbert Dep. at 21:21-22:1. Nurse Lewis instructed Tolbert to get up on his own and told Nurse McGinley and CO Jones not to assist Tolbert, because she believed he was uninjured, "faking," and could move on his own. Tolbert Dep. at 25:22-27-12. *See also* Lewis Report (noting "no signs of increased pain[,]" "no evidence of pain when inmate moved himself to get into a sitting position for vitals[,]" and "[inmate] sat up on his own with no evidence of increased pain"); McGinley Report (reporting "no visible injuries" and that the nurses "attempted to assist inmate to move but inmate refused requesting us to pick him up due to back pain. Inmate was able to sit up by himself and had full mobility of extremities[.]"). At that point, Tolbert had already been on the floor for approximately 25 minutes. *See* Tolbert Dep. at 20:7, 23:23-24. After this instruction from Nurse Lewis, everyone left Tolbert on the floor in the room. However, Tolbert was still in pain and could not get up on his own, so Tolbert's cellmate again requested assistance over the intercom. Approximately 15 minutes later, Nurse Lewis returned with a wheelchair and assisted Tolbert to his infirmary bed. *Id*. at 30:11-12, 32:6-7, 33:8-9.

Although Tolbert continues to insist that he was denied medical treatment, it appears to the Court at this stage that he is actually challenging the "adequacy, appropriateness, and effectiveness" of the treatment he received from Nurse Lewis, making this is a "classic case" where Tolbert simply disagrees with the medical treatment rendered. *See Baez*, 566 Fed. Appx. at 158. As described above, Tolbert acknowledges that after his fall, after calling Dr. Wiener for instructions, Nurse Lewis examined him, took his vitals, and after leaving him on the floor for approximately 30 to 40 minutes total, returned with a wheelchair and helped him back into his infirmary bed. *See* Tolbert Dep. at 22:21-32:9. Tolbert's submissions on summary judgment, accompanied by his medical records, therefore bely the accusation that he was denied treatment

by Nurse Lewis.  However, Tolbert is upset about Nurse Lewis's slow response, general

demeanor, and alleged belief that he was "faking" injury after his fall.

Tolbert has offered no circumstantial evidence to suggest that Nurse Lewis "subjectively

appreciated" that leaving him on the floor would create a serious risk of harm.  *See Pearson*, 850

F.3d at 539.  This case is unlike *Pearson v. Prison Health Services*, where the Third Circuit held

there was a genuine dispute of material fact where a prison nurse "forced" her "screaming

patient" to crawl to a wheelchair, and "a reasonable juror could find that [the nurse] knew [the

prisoner] could not walk and deliberately failed to assist him for non-medical reasons."  *Id*. at

537.  Here, Nurse Lewis did not "force" Tolbert to get up or crawl into a wheelchair on his own.

Instead, after she had examined him and taken his vitals, she instructed him to get up on his own;

he refused to do so, and she refused to pick him up.  Fifteen minutes later, she returned with a

wheelchair and helped him from the floor.  Before temporarily leaving Tolbert on the floor

without assistance, Nurse Lewis indicated that Tolbert could move on his own and that he was

"faking," expressing her belief aloud to him and to others in the room.  Therefore, the evidence

fails to show that Nurse Lewis drew an inference that a substantial risk of serious harm existed

by not immediately assisting Tolbert from the floor, *see Farmer v. Brennan*, 511 U.S. 825, 837

(1994) (explaining that the requisite mental state for deliberate indifference is not met "unless the

[prison] official knows of and disregards an excessive risk to inmate health or safety; the official

must both be aware of facts from which the inference could be drawn that a substantial risk of

serious harm exists, and he must also draw the inference"), because Nurse Lewis could not have

believed that Tolbert was uninjured or "faking" and simultaneously have believed that Tolbert

was substantially at risk of serious harm.[10]

Further, Nurse Lewis's response did not "so deviate[] from professional standards of care

that it amounted to deliberate indifference." *See Pearson*, 850 F.3d at 541.  Her 30-to-40-minute

delay in assisting Tolbert up from the floor after his fall, while possibly negligent, does not rise

to the level of deliberate indifference such that Tolbert can overcome summary judgment.  *See

Spruill,* 372 F.3d at 235 ("Mere medical malpractice, negligence, and courses of treatment

inconsistent with the desires of the prisoner . . . do not constitute deliberate indifference to

serious medical needs.").  At the risk of sounding needlessly repetitive, the undisputed record

reflects that, although Nurse Lewis did not immediately assist Tolbert from the floor, she

examined him after his fall, believed he was not seriously injured, and, after a short delay, helped

him back into his infirmary bed.  *See Roman*, 2020 U.S. Dist. LEXIS 76638, at *9 (internal

quotation and citation omitted) (explaining that "short delays in treatment unaccompanied by

arbitrary or unduly burdensome bureaucratic procedures, and the refusal to summon the medical

---

[10]     Although Tolbert asserts that Lewis's belief was wrong, and that she should have been
more concerned about his well-being in light of his recent surgery, both Tolbert's testimony and
medical records confirm that Nurse Lewis, rightly or wrongly, did not draw this inference, and
instead, subjectively believed that he was uninjured, able to move on his own without increased
pain, and possibly even "faking" injury.  Moreover, although the lack of evidence showing
subjective intent is dispositive on its own, other than his own unsupported assertions, Tolbert has
not produced any extrinsic evidence suggesting that Defendant Lewis's failure to draw that
conclusion was "'a substantial departure from accepted professional judgment, practice, or
standards' such that a reasonable jury could conclude that she "actually did not base [her]
decision on such judgment[,]'" *Pearson,* 850 F.3d at 539 (quoting *Youngberg v. Romeo*, 457
U.S. 307, 323 (1982)).  Nor has Tolbert produced any extrinsic evidence that he suffered any
detrimental effect from the 30-to-40 minutes spent on the floor after his fall.  A lay juror cannot
be expected to draw these conclusions without some supportive extrinsic evidence, such as
verifiable medical evidence or medical testimony.  Although Tolbert broadly claims that his fall-
related injuries are attributable to his neglectful post-fall treatment, his injuries are just as easily
attributable to the fall itself, and these unsupported assertions likewise cannot save the deliberate
indifference claim against Defendant Lewis.

specialist of the inmate's choice, perform tests or procedures that the inmate desires, or to explain to the inmate the reason for medical action or inaction does not amount to cruel and unusual punishment").

Deliberate indifference does not exist simply because Nurse Lewis could have provided better or swifter care than what Tolbert received.  Although leaving Tolbert on the floor for approximately half an hour after his fall may not have been the "best course of action" considering Tolbert's recent facial surgery and as well as his pain and discomfort, Tolbert is "not entitled to the *best possible care* so long as reasonable measures are taken to avoid substantial risk of serious harm."  *Manuel v. Atkins*, 545 Fed. Appx. 91, 94 n.4 (3d Cir. 2013) (emphasis added) (citing *Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997)).  Deliberate indifference is an "exceedingly high standard[,] and this standard is only met when "a deprivation is sufficiently serious, that is, where the official's act or omission results in the denial of the minimal civilized measure of life's necessities." *Baez*, 566 Fed. Appx. at 158 (citing *Farmer*, 511 U.S. at 834) (cleaned up).  Here, Nurse Lewis's actions, though rude, unprofessional, or perhaps negligent, were simply not sufficiently serious to meet the high standard of deliberate indifference.

For all of those reasons, the Court will grant summary judgment in favor of Nurse Lewis on the deliberate indifference claim.

*3. CO Jones*

Even when all of the facts are viewed in Tolbert's favor, his deliberate indifference claim against CO Jones cannot survive summary judgment.

In his response to the Commonwealth's summary judgment motion, Tolbert argues that there is a material dispute of fact on this claim because CO Jones[11] "knew Tolbert was recovering from head and facial injuries and surgery" after accompanying nurses and speaking directly with Tolbert, and also that CO Jones "had every reason to believe" Nurse Lewis was violating Tolbert's rights and DOC policy when she failed to immediately assist him from the floor. However, Tolbert's conclusory accusations are not enough to survive summary judgment.

"If a prisoner is under the care of medical experts . . . a non-medical prisoner official will generally be justified in believing that the prisoner is in capable hands." *Spruill*, 372 F.3d at 236. *See also Durmer v. O'Carroll*, 991 F.2d 64, 69 (3d Cir. 1993) (holding that non-medical defendants were not deliberately indifferent where "they failed to respond directly to the medical complaints of a prisoner who was already being treated by the prison doctor"). Therefore, a "non-medical prison official" is not deliberately indifferent "[a]bsent a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner[.]" *Spruill,* 372 F.3d at 236.

Here, CO Jones witnessed Nurse Lewis and Nurse McGinley respond to Tolbert after his fall in the infirmary. The nurses called Dr. Wiener for instruction, and thereafter examined Tolbert and took his vitals. Although Tolbert wanted the nurses to lift him from the floor, Nurse Lewis told Tolbert to rise on his own, based on her examination and belief that he was not injured. When Tolbert did not get up on his own, vocalizing that he was still in pain, Nurse

---

[11]     For the first time, in his response, Tolbert also characterizes his claim against CO Jones as a "Failure to Intervene/Protect" claim under the Eighth Amendment, claiming that Defendant Jones had a "duty to protect inmates" and a "duty to report Defendant Lewis' misconduct[.]" *See* Tolbert Resp. at 14. However, the Court is only addressing Tolbert's argument as it pertains to the deliberate indifference claim against Defendant Jones, as he did not plead a failure to protect claim in the Complaint. *See* Compl.

Lewis directed CO Jones not to lift Tolbert from the floor, telling him that she believed Tolbert was "faking" injury.  The three prison officials then left the room.  Fifteen minutes later, after being called again by Tolbert's cellmate, Nurse Lewis returned with a wheelchair and assisted Tolbert back to his infirmary bed.

Tolbert has failed to identify any reason for CO Jones to believe Tolbert was being mistreated, other than alleging that CO Jones knew Tolbert was recovering from a facial surgery. CO Jones observed the two prison nurses examine and aid Tolbert after his fall in the infirmary. Although CO Jones did not respond directly to Tolbert's complaints, no reasonable juror could find that he was deliberately indifferent where two nurses had already appraised the situation and instructed him not to assist the patient.  Moreover, CO Jones's failure to question or criticize Nurse Lewis's examination or belief about Tolbert's condition cannot on its own amount to deliberate indifference.

For those reasons, the Court will grant summary judgment in favor of CO Jones on Tolbert's deliberate indifference claim.

### C. Medical Malpractice

When deciding the motion to dismiss in this case, the Court allowed Tolbert' medical malpractice claims to proceed because the Court recognized that Tolbert "complied with Rule 1042.3, albeit in what may ultimately be a potentially problematic fashion, by attesting that expert testimony of an appropriate licensed professional is unnecessary for prosecution of the claim." *See Moore v. Wetzel*, No. 18-1523, 2019 U.S. Dist. LEXIS 36900, at *35-37 (M.D. Pa. Mar. 6, 2019) (explaining that these tort claims often require expert testimony to establish the elements of medical malpractice or prove causation, and once a plaintiff certifies that no expert is required to try his claim, the plaintiff will likely be precluded from introducing expert testimony,

which "may ultimately be fatal to a medical malpractice claim"), *adopted by* 2019 U.S. Dist.

LEXIS 51378 (M.D. Pa., Mar. 27, 2019).  *See* MTD Op., ECF No.  49, at 15.  However, at this

stage of the proceedings, the Court has been presented with a more developed record concerning

the need for expert testimony, and therefore concludes that Tolbert's medical malpractice claims

against Defendants Wiener and Lewis fail as a matter of law without expert testimony.

      As previously explained, once a plaintiff has certified that expert testimony is not needed

to prosecute his claim, "he is bound by that certification and absent exceptional circumstances is

precluded from introducing the expert testimony he needs on the standard of care and causation."

*Moore,* 2019 U.S. Dist. LEXIS 36900, at *36 (citations omitted).  *See also Liggon-Reading v.*

*Estate of Sugarman*, 659 F.3d 258, 265 (3d Cir. 2011) ("Pennsylvania law expressly allows a

plaintiff to proceed on the basis of a certification that expert testimony will not be required to

prove her claim.  Of course, the consequence of such a filing is a prohibition against offering

expert testimony later in the litigation, absent 'exceptional circumstances.' A filing under this

rule allows the case to proceed to discovery, leaving the consequence of the plaintiff's decision

to be dealt with at a later stage of the litigation, such as summary judgment or trial." (cleaned

up)).  Therefore, a plaintiff's certification that expert testimony is unnecessary may ultimately

become fatal to his medical malpractice claim at the summary judgment stage.  *See id.*

      Expert testimony is typically required to establish a medical malpractice claim unless

underlying facts are "so simple or the lack of skill or care is so obvious as to be within the range

of experience and comprehension of even non-professional persons."  *Hightower-Warren v. Silk*,

698 A.2d 52, 54 n.1 (Pa. 1997).  Here, Tolbert argues that expert testimony is not necessary

because the lack of care provided to him was so obvious that his malpractice claims fall under

the doctrine of *Res Ipsa Loquitur*.

*Res Ipsa Loquitur*,[12] which is Latin for "the thing speaks for itself," is a "narrow exception" to the general rule in Pennsylvania that a medical malpractice claim must rely on expert testimony. *See Njos v. United States*, No. 15-931, 2017 U.S. Dist. LEXIS 172460, at *18 (M.D. Pa. Oct. 17, 2017) (citation omitted).  To invoke this evidentiary exception, "three conditions must be met":

> "(a) either a lay person is able to determine as a matter of common knowledge, or an expert testifies, that the result which has occurred does not ordinarily occur in the absence of negligence; (b) the agent or instrumentality causing the harm was within the exclusive control of the defendant; and (c) the evidence offered is sufficient to remove the causation question from the realm of conjecture, but not so substantial that it provides a full and complete explanation of the event."

*Moulton v. United States*, No. 22-326, 2022 U.S. Dist. LEXIS 177981, at *7-8 (M.D. Pa. Sept. 29, 2022) (quoting *Toogood v. Rogal*, 824 A.2d 1140, 1149-50 (Pa. 2003)).

Here, Tolbert's medical malpractice claims against Dr. Wiener and Nurse Lewis consist of these providers' alleged deficient treatment in failing to send him to a neurologist and failing to immediately assist him after his infirmary fall, respectively, the facts of which are thoroughly discussed in the deliberate indifference section above.  Tolbert cannot establish that these defendants deviated from the standard of care or that this deviation caused increased pain or injury without expert medical testimony.  These issues are not so obvious as to fall within the realm of experience or common sense for a layperson, and *Res Ipsa Loquitur* is inapplicable in this case.

---

[12]     "The Pennsylvania Supreme Court has adopted *res ipsa loquitur* as articulated in the Restatement (Second) of Torts § 328D." *Moulton v. United States*, No. 22-326, 2022 U.S. Dist. LEXIS 177981, at *7 (M.D. Pa. Sept. 29, 2022) (citing *Quinby v. Plumsteadville Fam. Prac., Inc.*, 907 A.2d 1061, 1071 (Pa. 2006)).

Therefore, Tolbert's medical malpractice claims against Defendants Wiener and Lewis cannot survive summary judgment in the absence of expert testimony.

### D.  Retaliation

Tolbert alleges that Nurse Lewis and CO Jones failed to immediately help him off the floor after his fall in the infirmary because he had refused to take Tylenol from them earlier that day.  Tolbert's refusal to take a recommended medicine is a constitutionally protected activity. *See Napoleon*, 897 F.2d at 111 (recognizing the right to refuse unwanted medical treatment under the Due Process clause of the Fourteenth Amendment).  However, Tolbert's retaliation claims fail as a matter of law, because he cannot show that he suffered some adverse action at the hands of Lewis or Jones sufficient to deter a person of ordinary firmness from exercising his constitutional rights, nor can he establish causation.[13]

Other than the sheer fact that these two events with Nurse Lewis and CO Jones occurred on the same morning, Tolbert has failed to produce any circumstantial evidence that his post-fall treatment was causally connected to his refusal to take Tylenol or that the temporal proximity between these events was "unusually suggestive."  However, even assuming that a reasonable trier of fact should infer causation between his refusal to take Tylenol and his post-fall treatment, Tolbert's disagreement with the adequacy of medical treatment provided does not automatically convert those treatment decisions into "adverse actions" for purposes of a retaliation claim.  *See Williams v. Clark*, No. 18-315, 2021 U.S. Dist. LEXIS 242507, at *26 (W.D. Pa. Dec. 20, 2021), *aff'd*, No. 22-1068, 2022 U.S. App. LEXIS 12038 (3d Cir. May 4, 2022).  Here, the

---

[13]    To the extent that Tolbert is also alleging that CO Jones retaliated against him by threatening to write up a "misconduct" for Tolbert's failure to take Tylenol, this verbal threat alone is insufficient to support a retaliation claim.  *See Maclean v. Secor*, 876 F.Supp. 695, 699 (E.D. Pa. 1995) (explaining that a "constitutional claim based only on verbal threats will fail").

approximately half-an-hour delay between when Tolbert fell, received a medical examination, and was finally assisted off the floor, does not rise to the level of an adverse action. The Court fails to see how the post-fall medical treatment and assistance Tolbert received, albeit not administered as quickly as he would have liked, would deter an ordinary person from exercising his constitutional rights.  Therefore, this is not a case where a prisoner was completely denied medical care after exercising his constitutional rights, but one where he did not receive the precise medical care that he wanted.  *See Whitenight v. Harry*, No. 16-1350, 2019 U.S. Dist. LEXIS 11602, at *36 (M.D. Pa. Jan. 23, 2019) ("[D]efendants cannot be said to have taken an adverse action against [plaintiff] by providing him with medical care simply because it was not the medical care that the plaintiff desired.").

For those reasons, Tolbert's retaliation claims cannot survive summary judgment.

## V.  CONCLUSION

For all of the reasons articulated above, summary judgment is granted in favor of the defendants and against Tolbert on all of the remaining counts.  Because the Court is granting Defendant Wiener's summary judgment motion, Tolbert's motion for summary judgment against this defendant is denied.

A separate order follows.

BY THE COURT:


*/s/ Joseph F. Leeson, Jr.*
JOSEPH F. LEESON, JR.
United States District Judge

30
021224